IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                     No. CR 17-1229 RB

ROBERT ARELLANO,

      Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the government's Motion in Limine and Notice of Intent to Introduce Evidence as *Res Gestae* and of Prior Bad Acts Pursuant to Federal Rule of Evidence 404(b), filed on March 15, 2018 (Doc. 57), the United States' Motion to Strike the Untimely-Filed Response to Rule 404(b)/*Res Gestae* Notice, filed on April 10, 2018 (Doc. 69), and the government's Motion in Limine to Exclude Reference to the United States' Advisement of Rights to Shirley Arellano, filed on April 27, 2018 (Doc. 85). The Court heard oral argument on these motions on May 29, 2018. For the reasons explained below, the Court will **grant in part** the Motion in Limine and Notice of Intent to Introduce Evidence as *Res Gestae* and of Prior Bad Acts, **deny** the Motion to Strike, and **deny** the Motion in Limine to Exclude Reference to the United States' Advisement of Rights to Shirley Arellano.

**I.**     **Motion in Limine and Notice of Intent to Introduce Evidence as *Res Gestae* and of Prior Bad Acts Pursuant to Federal Rule of Evidence 404(b)**

    **A.**     **Background**

The government has charged Mr. Arellano with 13 counts of possessing a dog for the purpose of fighting in an animal fighting venture, in violation of 7 U.S.C. § 2156(b). (*See* Doc. 1.) On March 15, 2018, the government gave "notice of its intention to introduce evidence of

other crimes, wrongs or acts of the Defendant as *res gestae*, or" in the alternative, "pursuant to Federal Rule of Evidence 404(b) . . . ." (Doc. 57 at 1.) In addition to the 17 photographs and 2 video clips on which Judge Browning made preliminary findings at the January 18, 2018 motion hearing (*see* Doc. 66), the government has given notice that it intends to introduce 50 additional pieces of evidence. (*See* Doc. 57 at 4–5.) The government sorts these 50 documents and audio clips into five broad categories: (1) "dog 'pedigrees' handwritten by the defendant[,]" including references to certain dogs' fighting history, "kennel" names, injuries, kills, and sales prices; (2) "the defendant's handwritten notes pertaining to" the dog fighting venture, including notes on training, breeding, communications with other dog fighters, etc.; (3) "air waybills showing shipment of dogs to and from the defendant"; (4) advertisements defendant drafted for dog fighting magazines, as well as magazines that featured Defendant in articles and/or advertisements; and (5) "correspondence with other dog fighters." (*Id.* at 4.)

Mr. Arellano makes several general objections[1] to the evidence as a whole: (1) the proffered evidence is simply too old to be connected to the charged crimes (*see* Doc. 68 at 2–3, 5–6); (2) the government fails to establish the date of each item or provide the specific "legal rule of admissibility [that] applies to each item" (*id.* at 4); (3) where photos and videos do not depict Mr. Arellano, they cannot be defined "as a 'prior bad act' attributable to" him under Rule 404(b)(2) (*id.* at 4–5); (4) the age of the evidence shows that the government is using it to support the forbidden "inference that the defendant has the propensity to commit the bad act" (*id.* at 5, 6 (citing *United States v. Shirley*, 214 F. Supp. 3d 1124, 1146 (D.N.M. 2016)); (5) dog

---

[1] Mr. Arellano also makes two objections to the original 17 photographs and 2 videos (*see* Doc. 57 at 3) on the basis that (1) "[t]he government is unable to prove that any of its proffered photographs seized are those 13 dogs or that they were taken during the time frames Mr. Arellano is accused of wrong doing"; and (2) that the video evidence appears to have "occurred in another state, and did not even involve Mr. Arellano." (Doc. 68 at 2, 3.) Judge Browning previously ruled that those photographs and videos were admissible. (*See* Doc. 66 at 9:9–10:15, 51:14–18, 51:23–52:2, 52:8–12, 131:6–23, 132:6–21.) Thus, the Court declines to take up the first 19 pieces of evidence the government refers to in its motion. Defendant is free to raise an objection to this evidence as being cumulative at trial, if such objection is appropriate.

fighting was not illegal at the time Mr. Arellano participated in it (*see id.* at 6); (6) it is unfair to admit this evidence and also "limit [Defendant] from arguing to the jury that there is no evidence he was ever involved in a dog fight in the past" (*id.* at 6); and (7) the age of the evidence means it is irrelevant, and its probative value is outweighed by unfair prejudice to the Defendant (*id.* at 7–8).

B.     **Legal Standard**

The government seeks to admit the evidence under two theories: first, that it is "intrinsic" or "*res gestae*" evidence; and second, that it is "extrinsic" evidence admissible under Rule 404(b)(2). (*See* Doc. 57.) The discussion regarding intrinsic versus extrinsic evidence is largely academic. *See United States v. Lujan*, No. CR 05-0924 RB, 2011 WL 13210276, at *5 (D.N.M. May 11, 2011). The distinction often dictates how a court may consider character evidence under Rule 404.

Rule 404(a) prohibits the admission of evidence of a person's "bad character" to prove that the person acted in accordance with that character on a particular occasion. *See* Fed. R. Evid. 404(a)(1). Rule 404(b) prohibits the introduction of "prior bad acts"—that is, "[e]vidence of a crime, wrong, or other act"—in order to prove that the defendant has a general propensity to act in such a manner. *See* Fed. R. Evid. 404(b)(1); *see also Shirley*, 214 F. Supp. 3d at 1144 (citation omitted). The rule provides a nonexhaustive list of exceptions, however, which allows courts to admit "'other wrongs' evidence to be used for valid purposes 'such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Lujan*, 2011 WL 13210276, at *5, *6 (quoting Fed. R. Evid. 404(b)(2) (alterations in original)).

Importantly, "Rule 404(b) ***applies only*** to prior bad acts ***extrinsic*** to the crime charged." *Id.* (quoting *United States v. Kravchuk*, 335 F.3d 1147, 1155 (10th Cir.), *cert. denied*, 540 U.S.

941 (2003) (internal citation omitted)). Where the evidence is **intrinsic** to the crime charged, courts are not constrained by Rule 404. *See United States v. Irving*, 665 F.3d 1184, 1212 (10th Cir. 2011) (noting that "[i]f the contested evidence is intrinsic to the charged crime, then Rule 404(b) is not even applicable) (citation omitted); *United States v. O'Brien*, 131 F.3d 1428, 1432 (10th Cir. 1997) ("It is well settled that Rule 404(b) does not apply to other act evidence that is intrinsic to the crime charged . . . .") (citations omitted). Admission of either intrinsic and/or extrinsic evidence is not without its limits, as the court must engage in a Rule 403 analysis to determine whether the evidence is unduly prejudicial under either analysis. *See Lujan*, 2011 WL 13210276, at *10 (citations omitted).

The Tenth Circuit has defined "intrinsic evidence [as] that which is 'directly connected to the factual circumstances of the crime and provides contextual or background information to the jury. Extrinsic evidence, on the other hand, is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense.'" *Id.* at *6 n.10 (emphasis omitted) (quoting *United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009) (internal quotation omitted)). Aside from the difference in definitions, there are limited practical consequences to admitting evidence as either intrinsic or extrinsic. *See Lujan*, 2011 WL 13210276, at *10. For our purposes, the only relevant difference is that the Tenth Circuit has not required courts to give a limiting instruction for intrinsic evidence. *See id.* (citing *United States v. Green*, 175 F.3d 822, 831 (10th Cir.), *cert. denied*, 528 U.S. 852 (1999)). The Court cannot find any prohibition in either the rules or in the caselaw that prohibits courts "from giving a limiting instruction for intrinsic evidence if appropriate." *Id.* (citing Fed. R. Evid. 105). "Here, I will give limiting instructions where appropriate, without regard to the 'intrinsic' or 'extrinsic' nature of the evidence." *See id.*

## C. Analysis

Before turning to the disputed evidence, the Court notes that while Mr. Arellano makes several general objections in his responsive brief, he never cites a single, specific exhibit. (*See* Doc. 68.) The Court will begin by addressing and overruling four of Mr. Arellano's global objections.

First, Mr. Arellano complains that the government fails to establish the date of each item or provide the specific "legal rule of admissibility [that] applies to each item." (Doc. 68 at 4.) The Court notes initially that the government has provided sufficient arguments and notice to show why the evidence should be admitted as either intrinsic or extrinsic. (*See* Doc. 57.) In his second, related argument, Defendant contends that "much of those videos and photos were taken" in the 1970s–1980s when "it was not a crime to engage in dog fighting . . . ." (Doc. 68 at 6.) This is similar to an argument Defendant made with respect to the government's earlier noticed exhibits, and which Judge Browning overruled because the exhibits were items taken during the search of Defendant's home. (*See*, *e.g.*, Doc. 66 at 52:3–15 ("It seems to me the authentication argument is weak here, because it's found at the scene. It's real evidence.").)

To the extent that Defendant argues that the government will be unable to authenticate the noticed photographs and documents, the Court finds that the government may authenticate them as real evidence under Rule 901 because they were found at the crime scene. Objects that are "relevant because [they were] found at the scene of the crime," often referred to as "real" evidence, "are treated as independent substantive sources of evidence because the trier of fact may draw inferences from the objects themselves about some fact of consequence." 2 McCormick On Evid. § 213 (7th ed.); *see also United States v. Cardenas*, 864 F.2d 1528, 1531 (10th Cir. 1989) (noting that to admit real evidence that is "unique, readily identifiable and

relatively resistant to change," the proponent must provide the proper foundation by offering "testimony that the evidence is what its proponent claims") (citations omitted).

Instead, Defendant's arguments go more to the weight of the evidence, rather than to its admissibility. Defendant is free to point out any failure to date the documents/photographs, and the jury may consider that failure in deciding what weight to give the evidence. *See*, *e.g.*, *United States v. Hock Chee Koo*, 770 F. Supp. 2d 1115, 1124 (D. Ore. 2011) (finding that an "error in the creation date [of a document] goes to the weight of the evidence, not its admissibility") (citing *United States v. Catabran*, 836 F.2d 453, 458 (9th Cir. 1988) ("alleged inaccuracy of computer printouts went to weight, not admissibility")). Similarly, without proof that the evidence pre- or post-dates the federal statute criminalizing animal fighting ventures, *see* Pub. L. 94-279, 90 Stat. 417 (Apr. 22, 1976) (making it unlawful to "knowingly sponsor or exhibit an animal in any animal fighting venture to which any animal was moved in interstate or foreign commerce[,]" or "to sell, buy transport, or deliver to another person or receive from another person . . . any dog or other animal for purposes of having the dog or other animal participate in an animal fighting venture"), Defendant may argue to the jury the possibility that the documents pre-dated the relevant statutory authority, and the jury may consider that argument in deciding what weight to give the evidence. Importantly, Defendant does not point to any exhibit that obviously pre-dates the relevant statute. Therefore, the probative value of the exhibits is not so outweighed by the potential for unfair prejudice that the exhibits should be excluded.

Third, Mr. Arellano argues that where photos and videos do not depict Mr. Arellano specifically, they cannot be defined "as a 'prior bad act' attributable to" him under Rule 404(b)(2). (Doc. 68 at 4–5.) The Court finds that the fact Defendant is not pictured in every single photograph is not so prejudicial that it substantially outweighs the probative value of the

photographs. The jury may consider the Defendant's absence in the photos and videos when deciding what weight to give to each exhibit. *See United States v. Harris*, 534 F.2d 207, 213 (10th Cir. 1975) (finding that arguments regarding admissibility of photographs, including arguments that the photographs did not include the defendants/witnesses, went more to the weight of the evidence than its admissibility).

Fourth, Defendant asserts that it is unfair to admit the proffered evidence and also "limit [Defendant] from arguing to the jury that there is no evidence he was ever involved in a dog fight in the past." (Doc. 68 at 6.) Defendant points to no ruling in which the Court has precluded Defendant from making this argument. Moreover, the burden remains on the government to prove each element of the charged crime.

The Court will address Defendant's remaining arguments below in reference to the specific subcategories of evidence.

For simplicity's sake, the Court will adopt the government's numbering scheme to reference the subcategories of material at issue, beginning with subcategory 20 and ending with 33. (*See* Doc. 57 at 4–5.) Several of the subcategories of material contain multiple exhibits; for example, subcategory 20 includes exhibits 95–97. (*See id.*) Using the five categories of documents proposed by the government (*see id.* at 4), the Court will offer brief summaries and examples of each exhibit, followed by its ruling on the exhibits.

    **1.**    **Category 1: dog "pedigrees" with handwritten notes recording the lineage or "bloodline" of certain dogs, references to the dogs' fighting history and "kennel" names, references to injuries, kills, etc., sales prices, and dates.**

This category includes subcategories 20 (exhibits 95–97) and 21 (exhibit 98). The exhibits include handwritten notes recording the lineage of certain dogs, together with handwritten notes purportedly relevant to dog fighting (i.e., "Very hard mouth! 2 kills!" (Ex. 95);

"Heartworm ended his career early. He's been bred 3x's only with [sic] this past month. Litters of 7, 5, & 8. 7 males have won, 1x. 2 [males have] lost 1x. 1 female won 4x's . . . ." (Ex. 96); "1xW killed[,] 2xW in the pit . . . . She got her leg busted early in that match . . . . broke jaw now too." (Ex. 97); "won in :47" (Ex. 98 at 15/Bates 2755); "Arellano's Little Black" (*id.* at 20/Bates 2780)).

Exhibits 95–97 are one page each; exhibit 98 includes 366 pages of pedigrees and notes. Exhibit 98 also includes many references to dates. (*See*, *e.g.*, Doc. 98 at 52/Bates 2823 ("3/30/00").)

*Admissible as intrinsic evidence*

While he never cites any exhibit specifically, Defendant presumably objects to these exhibits on the grounds that they are too old to be "inextricably intertwined" with the current charges. (*See* Doc. 68 at 2–3, 5–6.) The government responds that while some of the material may be "decades old," these pedigrees are intrinsic evidence of "the selective breeding that resulted in dogs at issue in the charges, as well as the Defendant's . . . information tracking[] and ongoing dog fighting operation." (Doc. 77 at 4.) The Court finds that to the extent the government can tie the dogs listed on these pedigrees to any of the charged 13 dogs, the documents are intrinsic and admissible as necessary to complete the story of the charged crimes. While the documents may be older, any evidence regarding the breeding of dogs related to the 13 charged dogs is "directly connected to the factual circumstances of the crime and provides contextual or background information to the jury." *Irving*, 665 F.3d at 1212 (quotation and internal citations omitted). The Sixth Circuit has explained that "[p]roper background evidence has a causal, temporal or spatial connection with the charged offense." *See Shirley*, 214 F. Supp. 3d at 1149 (quoting *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000)). Defendant has

not cited authority mandating a bright line rule regarding how old evidence may be, and the Court finds that these documents are causally related in that they may reveal how Defendant bred the 13 dogs, they are temporally related to the extent they can show the line of dogs leading up to the 13 dogs, and they are spatially related to the extent that they were found in the search of Defendant's home. Moreover, they are not so far removed in time that any unfair prejudice outweighs their probative value.

*Admissible under Rule 404(b)(2)*

Alternatively, to the extent the documents cannot be tied directly to the 13 dogs, they are admissible under Rule 404(b)(2) for several reasons. Defendant argued at the motion hearing that to the extent these documents have no connection to the 13 dogs involved in the Indictment, they are not relevant and are only being offered to show Defendant's propensity for dog fighting. The Court disagrees. The Court finds that the government is not attempting to introduce this evidence merely to show Defendant's propensity to engage in dog fighting.

> [The Court] consider[s] a four-part test when determining whether evidence is admissible under Rule 404(b):
>
> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

*United States v. Smalls*, 752 F.3d 1227, 1237 (10th Cir. 2014) (quoting *United States v. Davis*, 636 F.3d 1281, 1297 (10th Cir. 2011) (internal and subsequent citations omitted)). Here, the Court finds that the evidence of the handwritten pedigrees may be offered to show Defendant's knowledge of breeding, as well as his preparation, plan, motive, intent, and lack of mistake in breeding and keeping the dog. Evidence of the handwritten notes regarding dog fighting

9

language may be offered to show Defendant's knowledge of the dog fighting world, as well as his intent and motive in breeding and keeping the dogs. This evidence is relevant to the charges, and the probative value of the evidence is not substantially outweighed by any potential for unfair prejudice.

Defendant may request a limiting instruction regarding exhibits 95–98, regardless of whether the evidence was admitted as intrinsic or extrinsic evidence. Defendant did not raise any objection related to cumulative evidence, but he will not be precluded from raising such an objection at trial, particularly because exhibit 98 is 366 pages and seems excessive for the government's stated purposes.

> **2.  Categories 2, 3, & 5: Defendant's handwritten notes re: dog fighting, including training, breeding, methods of destruction, communications and correspondence with other dog fighters, commerce, and do it yourself veterinary care.**

These categories includes subcategories 22 (exhibits 100–04, 111, 113, 116, 117–18, 124), 23 (exhibit 105), 24 (exhibits 106–10), 25 (exhibits 112, 114, 119, 121, 122, 158, 181), 26 (exhibits 115, 120), 27 (exhibit 123), 32 (exhibit 176), 33 (exhibits 159–60), and 31 (exhibits 168–75).

The documents in subcategories 22–24 include handwritten notes regarding Defendant's alleged dog fighting venture (i.e., "real deep game bitch[,]" "lost in :56 & won 2 in under :40 in Mexico[,]" "shot a shy bitch – she wasn't gonna be worth a damn[,]" "shot a chainfighter . . . house destroyer male!" (Ex. 100); "scratched to dead dog" (Ex. 101); "Died Asphyxiated when matched to be 'bred'" (Ex. 102); "match stock prospects" and "prospective buyers" (Ex. 103); "call R. Hoffman about a stud dog" "$1200.00" (Ex. 104); "'Jolley scratched so hard[,]" an address for L.G. Green in Shreveport, Louisiana (Ex. 111); address for Tom Garner in Hillsborough, North Carolina and notes addressed to "Tom," mentions St Louis MO, Belton

MO, "I would like to send her somehow in the next 5 days or so & breed her to . . . Adolph" (Ex. 113); "Walmart 900 + 180 = $1080 enough for 2 inseminations[,]" phone number for Tom Garner (Ex. 116); list of prices and dogs/supplies under the heading "Kingy" (Ex. 117); address and phone number for Kingy Holden in Huntsville, Alabama (Ex. 118); notes on "shock/after treatment" (Ex. 124); a page with multiple addresses and phone numbers, including one for Robert Hoffman in Obion, Tennessee (Ex. 105); "1 sent to guy in Oklahoma[,]" "one got off the chain" (Ex. 106); "bred to game dogs before[,]" "got his eye tore out" (Ex. 107); "in the pit[,]" "I've got Jeanette hooked in 8 wks[,]" "semen % low," 5/12/16 (Ex. 108); "was gonna breed to Ade, he got her ass end while she's in rape stance!!" "DOB: 10/20/15" (Ex. 109); "'Jazz' got killed by Rattlesnake at . . . Young's yard[,]" "6/29/2015[,]" "lost his eye 1st :20 & ended up killing the other in 1:35" (Ex. 110)).

The documents in subcategories 25 and 33 show air waybills and money gram documents (*see* exhibits 112 (air waybill from Bobby Holland in Tennessee to Defendant)); 114, 158 (air waybill from Tom Garner in North Carolina to Defendant); 119 (air waybill from Defendant to Kingy Holden in Alabama); 121 (air waybill from Chris (illegible) in Mississippi to Defendant); 122 (air waybill from Defendant to Darrell Jackson in Washington, D.C.); 181 (air waybill from Defendant to Justin Love in New Jersey); 159 (subpoena to Moneygram International); 160 (Moneygram records showing MoneyGram documents dated 2014, 2015, and 2016, sent from Defendant to Tom Garner in North Carolina, Kertis Gumbs in the Virgin Islands, Michael Southall in Maryland, Monte Gaines in New Jersey, and DaJuan Ware in Indiana)).

The documents in subcategory 26 include health certificates for two dogs. (Exs. 115, 120.)

11

The documents in subcategory 27 include 10 pages of handwritten notes detailing Defendant's "pre-keep" and "keep" training.[2] (Ex. 123.)

The document in subcategory 32 is marked as "mail communication to Robert Hoffman," (*see* Doc. 57 at 5), but it does not appear at first glance to be correspondence, nor can the Court find where it is addressed to Mr. Hoffman. Instead, the Court finds 17 pages of photographs—one has a man (presumably Mr. Arellano) labeled "Me & Billy's pups 7–8 wks old," and the rest are photographs of dogs.

The document and audio files marked as exhibits 168–75 are a written synopsis of calls and actual recordings from the New Jersey wiretap. (*See* Exs. 168–75.) Exhibit 168 includes summaries of five telephone calls—four of which reference "RA," presumably Robert Arellano. The fifth, dated October 8, 2015, does not reference RA.

The audio recordings in exhibits 169 and 170 are almost identical recordings of the same phone conversation, but exhibit 170 is almost one minute shorter. The audio recordings in 171 and 172 are almost identical recordings of the same phone conversation, but 172 is approximately 30 seconds shorter. The audio recording in 173 is a voicemail message that says "This is the Arellanos" and is presumably the voice of Defendant's wife, Shirley Arellano. The audio recordings in exhibits 174 and 175 are almost identical recordings of the same phone conversation, but exhibit 175 is almost 1.5 minutes shorter.

*Admissible as intrinsic evidence*

Again, Defendant never cites any exhibit specifically, but the Court presumes he objects to the apparent age of some of the documents. As before, the Court finds that to the extent the

---

[2] The notes state that "the 'prekeep' is solely for the purpose of getting [the dog] into workable weight for conditioning, & to try & get his gut fat out of him . . . ." (Ex. 123 at 1/Bates 6000.) The diet during the "keep" phase is to be fed "once a day to insure regularity & allow to be able to empty at showtime – that way he will not get hot or weak if he has anything in his stomach. . . . You can give [broth] to him up to 3 hrs. before his match & will not do any harm." (*Id.* at 10/Bates 6009.)

government can tie the dogs listed on these documents to any of the charged 13 dogs, the documents are intrinsic and admissible as necessary to complete the story of the charged crimes.[3] Any information regarding Defendant's dog fighting venture specifically related to the 13 charged dogs is "directly connected to the factual circumstances of the crime and provides contextual or background information to the jury." *Irving*, 665 F.3d at 1212 (quotation and internal citations omitted). Additionally, the documents do not appear to be so outdated that any unfair prejudice outweighs their probative value.

The Court will take up the issue of the wiretap audio recordings in a separate Memorandum Opinion and Order. With respect to the written synopsis in exhibit 168, the government has not shown how this exhibit is relevant. The Court will deny admission of exhibit 168 at this time.

*Admissible under Rule 404(b)(2)*

Alternatively, where the government cannot tie the written documents in these categories directly to the 13 dogs, the documents are admissible under Rule 404(b)(2) (with the exception of the rulings detailed above). Evidence regarding both dog fighting language and the care, keeping, training, and destruction of dogs may be offered to show Defendant's knowledge of the dog fighting world, as well as his preparation, plan, lack of mistake, intent, and motive in breeding and keeping the dogs. Evidence of air waybills and Moneygrams, as well as evidence related to pricing and other items related to interstate commerce are also appropriate as evidence of Defendant's preparation, intent, and motive in keeping his dogs. The evidence in these categories is relevant to the charges, and the probative value of the evidence is not substantially

---

[3] The government has not made this showing for every exhibit noticed here. The Court has already explained that there will be no practical consequences to admitting the exhibits as intrinsic or extrinsic, as the Court will issue limiting instructions as appropriate regardless of how the evidence is defined. The government may, however, wish to explicitly tie certain exhibits to the 13 dogs, where the issue goes to the weight of the evidence.

outweighed by any potential for unfair prejudice. The Court finds that the government is not attempting to introduce this evidence merely to show Defendant's propensity to engage in dog fighting.

Defendant may request a limiting instruction regarding any of the exhibits in these categories, regardless of whether the evidence was admitted as intrinsic or extrinsic. Defendant did not raise any objection related to cumulative evidence, but he will not be precluded from raising such an objection at trial.

> **3. Category 4: advertisements drafted or placed by Defendant in dog fighting magazines, and magazines in which Defendant was interviewed about dog fighting.**

This category includes subcategories 28 (exhibits 125–27), 29 (exhibit 130–31), and 30 (exhibits 128–29).

The documents in subcategories 28 include handwritten draft advertisements, presumably to place in dog fighting magazines. (Exs. 125–27.) Language in the ads includes "I don't breed for brood or breed stock" (Ex. 126); "I need to move pups . . . proven match & brood stock[,]" "above average mouth" (Ex. 127). The documents in subcategory 30 are actual advertisements in a publication entitled "Sporting Dog Journal." (Exs. 128–29.) Subcategory 29 includes two magazine articles in a publication entitled "The Connector Magazine." (Exs. 130–31.) In exhibit 130, Defendant is interviewed and discusses dogs he has owned and wins. (Ex. 130.) In exhibit 131, the editor thanks Defendant for sending in 76 pictures with handwritten notes on each; there is also an interview with Defendant. (Ex. 131.)

*Admissible as intrinsic evidence*

For the same reasons the Court described in the preceding sections, to the extent the government can tie the dogs pictured or named in these documents to any of the charged 13

dogs, the documents are intrinsic and admissible as necessary to complete the story of the charged crimes.

*Admissible under Rule 404(b)(2)*

Alternatively, where the government cannot tie the documents directly to the 13 dogs, the documents are admissible under Rule 404(b)(2). Evidence regarding Defendant's history and participation in the world of dog fighting may be offered to show Defendant's knowledge, intent, and motive in breeding and keeping the dogs. The Court finds that the probative value of the exhibits is not substantially outweighed by any potential for unfair prejudice, and the government is not attempting to introduce this evidence merely to show Defendant's propensity to engage in dog fighting.

Defendant may request a limiting instruction and is free to argue that any dog fighting referenced in the articles is not proven to have occurred after the practice was made illegal.

### 4. Unspecified Category: photographs of videotapes seized.

Exhibit 132, listed in subcategory 31, does not seem to fit in the five categories above. The exhibit is a photograph that shows handwritten labels on videotapes, including , "Julio's 'Fly-Girl' vs. M.D.D.'s 'Corri' – second match; [Fly-Girl] vs. M.D.D.'s 'Ebony' First Match," and "Sand Pitt Kennels – 2/97." (Ex. 132.) The Court finds little probative value in these photographs, as it is impossible to know what the videos actually show. The Court will deny the government's motion with respect to exhibit 132.

## II. Motion to Strike and Motion for Fees

The government moves to strike Mr. Arellano's response to the government's notice of intent. (*See* Doc. 69.) In his response to the motion to strike, Mr. Arellano asks that the government pay his legal fees for his time in replying to the "frivolous" motion. (*See* Doc. 71.)

This is not the first time the parties have advanced these motions based on substantially similar arguments. (*See* Doc. 75, 86.) The Court denied the motions before (*see* Doc. 95) and will do so here again for the same reasons.

III. **Motion in Limine to Exclude Reference to the United States' Advisement of Rights to Shirley Arellano**

An attorney for the government sent a letter to Shirley Arellano, Defendant's wife, on April 20, 2018, and filed the same with the Court. (*See* Doc. 84.) The letter advised Mrs. Arellano, who is noticed as a witness for the defense, that she "may wish to seek the advice of counsel before testifying, in the event that truthful answers posed to [her] by defense counsel or the government might subject [her] to liability." (Doc. 84-1.) Defendant later gave notice that he planned on entering the letter as an exhibit at trial. (Doc. 85 at 1.) The government now seeks to exclude the letter on the basis that it is irrelevant, inadmissible hearsay, and improper. (*Id.* at 2.)

The government first argues the letter is contrary to an accepted jury instruction that states: "It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crime charged. . . . The question of possible guilt of others should not enter your thinking as you decide whether this defendant has been proved guilty of the crime charged." (*See* Doc. 85 at 2 (discussing 10th Cir. Pattern Jury Instr. (Crim.) 1.19).) This jury instruction, however, does not serve to block evidence or testimony at trial. Rather, the jury instruction is a tool the Court will use to advise the jury not to consider the guilt or innocence of others, including Mrs. Arellano.

The government also argues that the document is inadmissible hearsay under Fed. R. Evid. 801(c). (Doc. 85 at 4.) While the Tenth Circuit has not expressly held "whether government's attorneys' statements are admissions by party opponents[,]" Judge Browning has admitted attorneys' statements in criminal cases under this rule. *See United States v.*

*Ganadonegro*, 854 F. Supp 2d 1088, 1102, 1126–27 (D.N.M. 2012). Regardless, Defendant asserts that the letter would not be offered to prove the truth of the matter asserted, but "to show the effect on the recipient of the statement, Mrs. Arellano, and her motivation to give truthful testimony." (Doc. 92 at 5.)

Finally, the government argues the letter is irrelevant, because it "is of *no* consequence in determining whether the defendant possessed dogs for the purpose of fighting." (*Id.*) Defendant disagrees and contends that the government threatened and attempted to coerce Mrs. Arellano into not testifying. (*See* Doc. 92 at 2.) Defendant maintains that because the government wrote Mrs. Arellano in an attempt to stop her from testifying, and the letter is evidence of her credibility. (*Id.* at 3–5.)

While the Court disagrees with Defendant's characterization of the letter as a threat, the Court declines to exclude the letter at this time. Counsel for Defendant may move to admit this letter on the issue of Mrs. Arellano's credibility at an appropriate time.

**THEREFORE,**

**IT IS ORDERED** that the government's Motion in Limine and Notice of Intent to Introduce Evidence as *Res Gestae* and of Prior Bad Acts Pursuant to Federal Rule of Evidence 404(b) (Doc. 57) is **GRANTED IN PART** as outlined above;

**IT IS FURTHER ORDERED** that the United States' Motion to Strike the Untimely-Filed Response to Rule 404(b)/*Res Gestae* Notice (Doc. 69) is **DENIED**; and

**IT IS FURTHER ORDERED** that the government's Motion in Limine to Exclude Reference to the United States' Advisement of Rights to Shirley Arellano (Doc. 85) is **DENIED**.

_____
ROBERT C. BRACK
UNITED STATES DISTRICT JUDGE