IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                          No. CR 17-1229 RB

ROBERT ARELLANO,

    Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on defendant Robert Arellano's motion to suppress the intercepted calls and their fruits (Doc. 25), and Mr. Arellano's motion to suppress the statements of another individual, Anthony Gaines, from excerpts of the recorded calls (Doc. 61). The Court denies the motion to suppress the intercepted calls, but grants in part the motion to suppress Mr. Gaines's statements from the excerpts of recorded calls.

## FACTS

On October 6, 2015, law enforcement agents submitted to the Superior Court of New Jersey an *ex parte* application for a wiretap order. The agents wanted to surveil Anthony "Monte" Gaines and "other identified and unidentified individuals" for evidence of potential drug law violations.[1] The defendant, Robert Arellano, was not mentioned in the affidavit.

Although the affidavit explained that "extrinsic minimization" is the "cutting back [of] the hours of interception, during the period of wire and electronic interception," the affidavit did not explain when or how extrinsic minimization would be used. (Doc. 25, Ex. 1 (First wiretap affidavit) at 101.) The affidavit also mentioned "intrinsic minimization," but only to say that

---

[1] Specifically, N.J. Stat. Ann. § 2C:35-3, Leader of Narcotics Trafficking Network; N.J. Stat. Ann. § 2C:35-5, Manufacturing, distributing or dispensing, as well as conspiracy to commit those crimes.

intrinsic minimization is not feasible for intercepted electronic communications like text messages. (*Id.* at 104.) There was no explanation of what intrinsic minimization entailed, nor was there a description of when or how the agents would use intrinsic minimization.

The New Jersey Superior Court entered the order that same day, finding probable cause to believe that the individuals listed in the affidavit had violated the specified drug laws. In its order, the New Jersey Court stated that "the interception shall end as soon as practical and be conducted in such a way as to minimize or eliminate the interception of communications other than the type described herein by making reasonable efforts, whenever possible, to reduce the hours of interception authorized by this Order . . . ." (Doc. 25, Ex. 2 (Wiretap Order) at 7.)

On October 8, 2015, agents intercepted a call between Mr. Gaines and Mr. Arellano. According to Mr. Arellano, the call lasted about 42 minutes and did not involve the drug offenses justifying the wiretap. The call did, however, involve discussion that implicated dog fighting.

On notice that agents may have captured "other crime evidence," a prosecutor with the state of New Jersey wrote a letter to the judge supervising the wiretap. The letter, dated October 13, 2015, contains the following information:

- Law enforcement intercepted calls that apparently relate to dog fighting.
- The calls are between Mr. Gaines and "an unknown individual who appears to be from New Mexico."
- "There have been other calls containing what [law enforcement] believe[d] to be CDS[2] Distribution pertinent conversations which include references to dog fighting."

---

[2] Controlled Dangerous Substances

- New Jersey has no statute barring dog fighting, except for perhaps cruelty to animals, which law enforcement cannot investigate with a wiretap.
- The New Jersey prosecutor "had instructed" monitors to "minimize calls related to dog fighting unless there is also a CDS pertinent reason to monitor the call."
- But "upon further consideration," the prosecutor noted that "dog fighting is customarily associated with gambling," which law enforcement may investigate with a wiretap.
- The prosecutor notified the U.S. Attorney's Office.
- The prosecutor promised to notify the Court if there was "a change in circumstances necessitating an amendment to the [wiretap order]."

(*See* Doc. 25, Ex. 4 (Letter to Judge).)

The prosecutor never sought an amendment to add gambling as an offense under investigation. Following the letter, and before the 30-day wiretap period ended, the government intercepted at least some parts of four more calls, on October 19, 23, 25, and 30, 2015. (*See* Doc. 25, Ex. 3 at 1–3.)

On November 4, 2015, law enforcement sought to extend the wiretap for another 30 days, submitting an *ex parte* application for an extension order. The affidavit did not mention Mr. Arellano, dog fighting, or gambling. The Superior Court of New Jersey entered an extension order, which contained the same minimization language as the previous order authorizing the wiretap. That same day, the government intercepted another call between Mr. Arellano and Mr. Gaines.

On November 19, 2015, state prosecutors asked the judge supervising the wiretap for an order to disclose, which would allow them to share other crime evidence obtained from the

3

wiretap with other law enforcement agencies. Specifically, state prosecutors wanted to share with federal agents and prosecutors all orders, affidavits, and " 'contents of conversations and data intercepted throughout the course of the investigation' for the purpose of investigating and presenting to a grand jury" evidence of certain crimes, including violation of 7 U.S.C. § 2156, which prohibits animal fighting ventures. (Doc. 29 at 3.)

The supervising judge authorized the requested disclosure. Although the supervising judge said that she "made findings of fact and conclusions of law," she did not specify her findings and conclusions. (*See* Doc. 29, Ex. 2 at 3.)

Following disclosure, federal agents investigated Mr. Arellano, culminating in a May 20, 2016 application for a search warrant to search Mr. Arellano's house. The application stated that there was probable cause to believe that there would be evidence of dog fighting in Mr. Arellano's house. (Doc. 29, Ex. 7 (Search warrant application) at 17.) This conclusion relied heavily on what the government claimed to be lawfully-intercepted calls between Mr. Arellano and Mr. Gaines. But contrary to Mr. Arellano's belief, the application also relied on evidence apart from the intercepted calls.

On "Peds Online," a website that dog fighters use to post breeding information to prove and verify dog lineage, the government found about 80 dog pedigrees for fighting dogs that identify Mr. Arellano as either the breeder or owner. (*See id.* at 12–13.) Eleven of the 80 pedigrees contained pictures of dogs, and scars or injuries are visible in 6 of the photographs. (*Id.* at 13.) Some photographs also have handwritten notations, such as "2xW," "5xw," "CH," or "GR CH." (*Id.*) Steve Romero, Special Agent with the U.S. Department of Agriculture Office of Inspector General, swore that these notes refer to the dogs having won multiple dog fights. (*Id.*)

Several pedigrees from Peds Online that identified Mr. Arellano as the owner or breeder "contained the dog 'CH Wood's Miss Pool Hall Red 5xW ROM' in the bloodline." (*Id.* at 14.) In an intercepted call between Mr. Gaines and "Person #1," Mr. Gaines references his "Arellano dog . . . my little Pool Hall bitch." (*Id.*) In another intercepted call, between Mr. Gaines and "Person #2," Mr. Gaines told Person #2 that "he has 'Pool Hall stuff' from the man he gets his dogs from in New Mexico." (*Id.*)

In yet another intercepted call, between Mr. Gaines and "Person #3," Mr. Gaines tells Person #3 that he was "in possession of a female dog he got from [Mr. Arellano]." (*Id.*) Mr. Gaines also "described the pedigree of one of his dogs to an unknown male and said she came from [Mr. Arellano]." (*Id.*) And Mr. Gaines told "Person #5" that "he pays [Mr. Arellano] several hundred dollars per dog." (*Id.* at 15.)

Mr. Gaines told "another dog fighter on October 20, 2015[,]" that Mr. Arellano "just put . . . one through the air." (*Id.* at 16.) On the basis of intercepted communications, Special Agent Romero sought and obtained air waybills that show Mr. Arellano shipped dogs through Delta Air Lines. (*Id.* at 15–16.)

Agents also conducted ground and aerial surveillance of Mr. Arellano's house. They saw "nine small square chain-link fence dog enclosures, each separated from the other by at least several feet." (*Id.* at 16–17.) They saw dogs in four of the enclosures, as well as dog houses in three of the enclosures. (*Id.* at 17.) The ground in the area was worn in an arc pattern, which Special Agent Romero said was indicative of a "chain spot," or a radius-like disruption to the ground resulting from a dog dragging on a chain to which it is tethered. (*Id.*)

After viewing the evidence presented in the warrant application, a magistrate judge approved the search warrant, and law enforcement searched Mr. Arellano's house on May 20,

5

2016. The agents seized all manner of evidence in Mr. Arellano's house, including photographs, videos, hard drives, and dogs.

Mr. Arellano was arrested on June 1, 2016, on a complaint issued out of the U.S. District Court for the District of New Jersey, alleging that Mr. Arellano conspired with others to violate federal dog fighting prohibitions. (Doc. 25 at 8.)

On May 9, 2017, the U.S. Attorney's Office in the District of New Mexico filed another indictment against Mr. Arellano, charging him with the possession of 13 dogs for purposes of having the dogs participate in an animal fighting venture. (*Id.* at 8–9.)

On June 21, 2016, New Jersey prosecutors applied to the supervising wiretap judge for disclosure of the intercepted communication "to any attorney assigned to represent any defendant[] charged as a result of this investigation" or "for any other purposes pursuant to the prosecution of this matter." (Doc. 29, Ex. C at 6.) The New Jersey court granted the application. (Doc. 29, Ex. D.)

At trial, the government wants to introduce excerpts of the October 8, October 19, and October 30 calls between Mr. Arellano and Mr. Gaines.

## DISCUSSION

**I. Suppression of the October 8, 19, and 30 Calls.**

    **a. Applicable law.**

Evidence from state wiretaps may only be used in federal court if state law enforcement complied with both federal and state laws—*even if state law gives more privacy protection than federal law*. *See United States v. McNulty*, 729 F.2d 1243, 1264–65 (10th Cir. 1983). The parties have represented to the Court that New Jersey and federal wiretap laws are substantially the same, (*see* Doc. 98 at 1), so the Court will analyze the wiretap under federal law.

18 U.S.C. § 2518(5) requires that a wiretap "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ." Whether law enforcement complied with this instruction depends on whether minimization efforts were reasonable. *See United States v. Killingsworth*, 117 F.3d 1159, 1165 (10th Cir. 1997). Reasonableness, in turn, depends on "an evaluation of the 'facts and circumstances of each case.'" *Id.* And "when factual issues are involved in deciding a motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d).

Additionally, § 2517(5) allows law enforcement to use, in certain circumstances, evidence of another crime that is intercepted pursuant to a valid wiretap. The Tenth Circuit affirmed the constitutionality of § 2517(5) in *United States v. Cox*, 449 F.2d 679, 686–87 (10th Cir. 1971). Depending on the circumstances, "other crime evidence" *sometimes* can be used even if the crime is not enumerated in § 2516 (the section that lists crimes for which a wiretap is a valid investigative tool). *See United States v. Cardall*, 773 F.2d 1128, 1134 (10th Cir. 1985). Depending on the circumstances, other crime evidence *sometimes* can be used even without an amendment to an existing wiretap. *See United States v. Kerr*, 711 F.2d 149, 151 (10th Cir. 1983). And depending on the circumstances, other crime evidence that law enforcement anticipates is *sometimes* admissible. *See United States v. McKinnon*, 721 F.2d 19, 23 (1st Cir. 1983).

As signaled above, the use of other crime evidence is not without limits. Such evidence must be truly incidental to a valid bona fide investigation into an enumerated crime. *See id.* Essentially, other crime evidence is admissible as long as a wiretap is properly executed and there is no bad faith or pretext. *See In re Grand Jury Subpoena Served on Doe*, 889 F.2d 384, 387 (2nd Cir. 1989); *United States v. Smith* 726 F.2d 852, 865 (1st Cir. 1984). This means that the government is flatly wrong when it contends that other crime evidence need never be

minimized, (*see* Doc. 98 at 2), or when it asserted at oral argument that the subjective intent of law enforcement agents does not matter. As the Court explains below, if there is no good faith basis to believe that a communication would produce evidence of the target crime, then the government must follow standard minimization procedures. And if law enforcement agents are only listening to a conversation to catch a crime that is not the target of the wire, then the other crime evidence is anticipated *and* is not incidental. *See Smith*, 726 F.2d at 865 (explaining the illegality of using "a warrant authorizing seizure of one type of evidence as a license to collect evidence of an offense not covered by the authorization"); *McKinnon*, 721 F.2d at 22–23 (discussing the difference between something being unanticipated and something being incidental). In such circumstances, the agents are guilty of pretext and bad faith, and the resulting evidence will be suppressed. *See Smith*, 726 F.2d at 865; *McKinnon*, 721 F.2d at 22–23.

Once law enforcement obtains other crime evidence, it must secure judicial approval "as soon as practicable" to *disclose or use* such evidence in a judicial proceeding. § 2517(5). There is a difference between *disclosure* and *interception*, however. If law enforcement violates § 2517(5) by improperly *disclosing* evidence, a defendant can only seek a civil remedy through § 2520, not suppression. *Cardall*, 773 F.2d at 1134. Suppression, provided for in § 2518(10)(a), is only allowed if the evidence was *unlawfully intercepted*. *Id.*

**b. Minimization analysis.**

At the outset, the Court again emphatically rejects the government's contention that other crime evidence *never* has to be minimized if captured during the course of a wiretap. The government relies on a passage in *Cox* where the Tenth Circuit says:

> It would be the height of unreasonableness to distinguish between information specifically authorized and that which is unanticipated and which develops in the course of an authorized search such as that involved here. It would be irrational to hold that officers authorized to listen to conversations about drug traffic, upon

> learning that a bank robbery is to occur, must at once close down the project and not use the information to prevent the robbery since the information is tainted. It would be demoralizing to allow the bank to be robbed while the investigators stood by helpless to prevent the occurrence.

*Cox*, 449 F.2d at 687. But this quote does not tell the whole story.

First, *Cox* considered a facial challenge to the other crime provision (§ 2517(5)), and the Court there assumed that the wiretap was executed in accordance with all the provisions of the wiretap statute. *See id.* at 681. This means that the *Cox* Court assumed law enforcement complied with § 2518(5)'s minimization requirement. *See id.*

Second, the Tenth Circuit in *Cox* lamented about the "unmanageability generally of electronic surveillance," noting that the imprecise nature of electronic surveillance unfortunately meant that a wide swath of non-target communications would also be captured. *See id.* at 686. The unavoidable overbreadth of electronic surveillance was particularly problematic, according to *Cox*, because the surveillance involved "prob[ing] the thoughts of the man who is the object of the search." *See id.* As the Tenth Circuit cautioned:

> The thought of man shall not be tried, for the devil himself knoweth not the thought of man.

*Id.* at 687 n.13 (quoting Y.B. 7 Edw. IV, f. 2, pl. 2 (Chief Justice Bryan in an ancient Year Book case)); and

> The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance. . . . No longer is it possible, in short, for each man to retreat into his home and be left alone. Every spoken word relating to each man's personal, marital, religious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the auditor's advantage.

*Id.* (quoting S. Rep. No. 1097, 90th Cong., 2d Sess., 1968 U.S. Code Cong. & Ad. News at 2112, 2154 (1968)).

And yet, after bemoaning the great threat electronic surveillance poses, the *Cox* Court finally throws up its hands, decides that Congress did all it could do to comply with the law given the unwieldy nature of electronic surveillance, and inserts the government's favorite quote about the unreasonableness of unhearing what the government already heard.

The government's takeaway is that it can listen, without minimizing, to any conversation that includes other crime evidence as long as the wiretap *started* with a valid intent and the period of the wiretap has not expired. (*See* Doc. 66 at 162:3–8 (explaining the government's view that there is pretext when the wiretap was a "total sham" from the beginning); Doc 98 at 2 ("minimization of other crimes evidence is not required in the first place").) Basically, the government believes minimization is unnecessary even if, during the course of a valid wiretap, agents lose their good-faith belief that the conversation will produce evidence of the target crime. (*See* Doc. 66 at 162:3–8; Doc 98 at 2.) That reading is too broad.

Taking into account the *Cox* Court's presumption that law enforcement complied with all provisions of the wiretap statute, and the *Cox* Court's concern about the imprecise nature of electronic surveillance, a fairer interpretation of *Cox* is that if the government anticipates intercepting evidence of the target crime, and incidentally captures evidence of another crime, then it simply cannot be helped. But if the government ignores the minimization provision of the wiretap act when it is clear that a communication would not yield evidence of the target crime, then any other crime evidence would not be incidental, and such evidence would not be allowed.

Turning to the calls the government plans to introduce, the October 8 call was reasonably minimized. At the very beginning of the call, the parties discussed "pills." (*See* Doc. 98, Ex. B (Tr. of Oct. 8 Call) at 2.) Since the wire was established to target drug crimes, the reference to pills could have triggered red flags that justified further listening. Additionally, there is scattered

language throughout the call that reasonably could be coded drug references, such as talk of "Jeep Rascal Stuff," (*see id.* at 4:12–13), and talk of "some Chinaman type of stuff," (*see id.* at 34:22). And the monitors did minimally minimize the call. (*See id.* at 12:4, 13:2.) Since this call was intercepted during the early stages of the wiretap investigation—when it is difficult to determine the relevancy of conversations—and since the law does not demand perfect differentiation of innocent and criminal conversations, the Court finds that the October 8 call was reasonably minimized. *See Killingsworth*, 117 F.3d at 1166.

Likewise, the October 19 call was reasonably minimized. In that call, the monitor appears to have utilized good-faith spot-checking: after listening to just over two minutes of the initial conversation, the monitor apparently alternated between minimizing for about 20–30 seconds and listening to about 20–30 seconds of conversation. (*See* Doc. 98, Ex. C (Tr. of Oct. 19 Call).) The conversation was minimized a total of 27 times, and the fact that the monitor adhered to the minimization pattern even when it caused some minimizations to occur in the middle of inculpatory dog-fighting conversations signals the monitor's good faith. (*See* Tr. of Oct. 19 Call.)

The October 30 call also appears to be reasonably minimized. That call is peculiar in that, although Mr. Gaines and Mr. Arellano already had two conversations that did not involve drugs, the government minimized less than it did during the October 19 call. Still, the monitor appears to have followed a general spot-checking pattern during the October 30 call—including minimizing in the middle of inculpatory exchanges—and Mr. Arellano has not shown that the spot-checking for this call was inadequate. (*See id.*)

In sum, the October 8, 19, and 30 calls were reasonably minimized.

### c. Good faith and pretext analysis.

The government was wrong when it asserted at oral argument that the subjective intent of agents in capturing a call does not matter. Other crime evidence is only lawfully intercepted if it is incidental to a good faith investigation into the crime that justified the wiretap. *See Smith*, 726 F.2d at 865; *McKinnon*, 721 F.2d at 22–23. If the investigation into the target crime is just pretext for the government to listen to the other crime evidence, then the interception is unlawful. *See Smith*, 726 F.2d at 865; *McKinnon*, 721 F.2d at 22–23.

Here, there is insufficient evidence to find that the government acted in bad faith when obtaining the communications between Mr. Arellano and Mr. Gaines. The first call was early into the wiretap and contained possible references to drugs throughout. The next two calls appear to have been spot-checked, with the monitors adhering fairly strictly to a minimization pattern that cut out inculpatory dog-fighting evidence.

The Court notes, however, that the New Jersey prosecutor's letter to the supervising wiretap judge raises concerns. The letter reads:

> Please accept this letter as notification concerning other crimes evidence, involving the above referenced matter.
>
> We have intercepted calls which appear to be related to dog fighting between the target of this Order and an unknown individual who appears to be from New Mexico. There have been other calls containing what we believe to be CDS Distribution pertinent conversations which include references to dog fighting. New Jersey has no statute on point other than cruelty to animals, which is not an enumerated offense under the Wire Tap Act. In an abundance of caution I had instructed that our monitors be told to minimize calls related to dog fighting unless there is also a CDS pertinent reason to monitor the call.
>
> Upon further consideration, dog fighting is customarily associated with gambling, which is an enumerated offense. The United States Attorney's Office has been advised and is looking into the matter.
>
> I will contact the Court should there be a change in circumstances necessitating an amendment to the Order.

(Letter to Judge.)

First, the prosecutor represented to the New Jersey judge that his office had intercepted "calls" (plural) involving an individual from New Mexico. When the letter was mailed on October 13, 2015, however, the government had intercepted only one of Mr. Arellano's calls—the October 8, 2015 call. The government attributed this misstatement, which could have colored the New Jersey court's perception of the situation, to a typographical error.

Second, the placement of the statement "[t]here have been other calls containing . . . CDS Distribution pertinent conversations"—which the Court understands to refer to calls between Mr. Gaines and other individuals—could have been misleading since one could easily make the mistake, given the preceding sentence and lack of clarification, of thinking that the letter was referring to conversations between Mr. Arellano and Mr. Gaines.

Third, the prosecutor says "I had instructed that our monitors be told to minimize calls related to dog fighting unless there is also a CDS pertinent reason to monitor the call." Does the "had instructed" signify that this minimization instruction is moot? Or does it mean that he already instructed the monitors to minimize accordingly?

Fourth, "[u]pon further consideration, dog fighting is customarily associated with gambling, which is an enumerated offense." Was this a half-hearted pass at pretext? If law enforcement had sought a wiretap for gambling, and all they could offer was one dog-fighting conversation and the allegation that "dog fighting is customarily associated with gambling," they would be hard-pressed to find any judge willing to approve the application.

The prosecutor's letter to the New Jersey judge is no model of clarity, and it raises inferences of bad faith. But in light of the fact that the October 8, 19, and 30 calls look to be

adequately and non-discriminately minimized, the Court narrowly finds that the other crime evidence in the calls was not acquired through pretext.

Because the calls in question were adequately minimized and the government acted without pretext, the calls will not be suppressed. The evidence from those calls, along with the government's independent investigative efforts discussed above—the air waybills, Peds Online, physical and aerial surveillance, etc.—provide probable cause for the search warrant for Mr. Arellano's house.

**II. Mr. Gaines's statements in the October 8, 19, and 30 calls**.

Having ruled that the October 8, 19, and 30 calls will not be suppressed, the Court must determine what portions of those calls are admissible. The government does not seek to introduce the entire calls, but only excerpts of the October 8 call (Doc. 67, Ex. A), the October 19 call (Doc. 67, Ex. B), and the October 30 call (Doc. 67, Ex. C). In those excerpts, Mr. Arellano's statements are admissible as statements of a party opponent, Fed. R. Evid. 801(d)(2)(A), but Mr. Gaines's statements would have to clear the hearsay hurdle.

To introduce Mr. Gaines's statements in its exhibits A–C, the government argues that those statements only provide "little more than context and filler" and are not offered for truth. (*See id.* at 3–4.)

Although the government's rationale for admitting Mr. Gaines's statements is to provide context, the government does not invoke Fed. R. Evid. 106 (the Rule of Completeness), which provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. Instead, the government relies on *United States v. Collins*, 575 F.3d 1069 (10th Cir. 2009) for the

proposition that statements that merely provide context and are not offered for truth are admissible. *See id.* at 1073. But the government misreads *Collins*.

In *Collins*, the district court admitted the entire audio recording of an interview between two law enforcement officers and the defendant. *See id.* at 1071. On appeal, the government argued that the recording's admission did not violate the hearsay rule because "an interviewer's statements are offered to provide context for the interviewee's answers, rather than for the truth of the matter asserted." *Id.* at 1073. The Tenth Circuit derided this rationale as a "malleable notion," and added that it was "skeptical of the government's argument that all of [the law enforcement agents'] statements . . . provide meaningful context." *Id.* at 1073. The Circuit went on to say that "[i]nvoking the word 'context' does not permit an end-run around the hearsay rules such that the government may smuggle into evidence all interviewer statements. We view such evidence with a particularly jaundiced eye when, as here, the officers' statements regularly overwhelm the defendant's." *Id.* at 1074. In the end, the Circuit did not decide whether the government's rationale had merit: "[b]ut we need not decide whether it was error to admit the entire recording because we conclude that if it was error, the error was harmless." *Id.*

At oral argument, the government described *Collins* as showing the "outer limits" of the context argument. But if *Collins* had delineated an outer limit, then it would have held that the district court did not err in admitting the entire recording. *Collins* did not do so, instead ruling that even if the district court overstepped the outer limits of the context rationale, that error would be harmless given the weight of the evidence against the defendant.

So *Collins* does not help the government. What *Collins* does, however, is provide guidance on how to evaluate a "context" argument: the context has to be "meaningful" and

15

courts should be especially doubtful of the context rationale when the proffered statements overwhelm legitimate statements.

In addition, if Mr. Gaines's statements really provide "little more than context and filler," (*see* Doc. 67 at 3), then the Court should be wary of allowing their potential prejudice to substantially outweigh their small probative value, *see* Fed. R. Evid. 403.

Keeping in mind that context must be meaningful, must not overwhelm legitimate statements, and must not be unduly prejudicial, the Court suppresses certain statements as described below. Of course, Mr. Arellano can invoke the Rule of Completeness to have some statements admitted if he feels that certain cuts would cause a misleading impression.

Excerpt of October 8 call.

The following statements will be suppressed because they are unduly prejudicial given their very limited role as "mere context and filler," and a limiting instruction would be insufficient to cure the prejudice:

- "Yeah. But you know what? I never had a dog get sick off of it." (Doc. 67, Ex. A at 2:21–22.)

- "What, did it get their gums white and stuff?" (*Id.* at 3:3.)

- "Oh, got her woozy." (*Id.* at 3:13.)

- "All right. So listen to this. So listen to this, Mr. Bob. You think a lot of people fuck they dogs up in keep like that? Because I see that a lot." (*Id.* at 4:3–5.)

- "He was that high strung though?" (*Id.* at 5:14.)

And the following statement does not provide meaningful context: "I'm gonna tell you what I think people do in keep." (*Id.* at 4:7–8.)

Excerpt of October 19 call.

The following statements do not provide meaningful context and will be suppressed:

- "I know he got a healthy dog back. I know he thanking you for that, man." (Doc. 67, Ex. B at 2:6–7.)
- "He a big boy, huh, Bob." (*Id.* at 2:10.)

Excerpt of October 30 call.

The following statements will be suppressed because they overwhelm legitimate statements and are unduly prejudicial:

- "Nah, Mr. Bob, man. One of my spots where I had the dogs down there, he got into a fight, down at that land where I had the dog at." (Doc. 67, Ex. C at 3:4–6.)
- "And when I came down there, the next day to feed the dogs, man, I seen the fuckin'—the animal people, I seen a, um, a note on the door—" (*Id.* at 3:8–10.)
- "—it said, um, yeah, it said give them a call within 24 hours. I went back there in the woods. The dogs was still there. I just grabbed them up." (*Id.* at 3:12–14.)
- "Yeah, so, I got all them in the house right now. So, I really gotta move out, you know what I mean?" (*Id.* at 3:16–17.)
- "I be big ass Tahoe here. These shits nice though, them new Tahoes. Pedro acting like he ain't got no damn money. I'm bringing the dogs down to him. If he had to pay a transporter, he'd pay more than that." (*Id.* at 3:19–22.)

**CONCLUSION**

For the reasons provided, the Court **denies** Mr. Arellano's motion to suppress the intercepted calls and their fruits as it relates to the government's noticed evidence (Doc. 25). The

Court **grants in part** (the Court declined to exclude certain statements Mr. Arellano objected to) the motion to suppress Mr. Gaines's statements from the excerpts (Doc. 61).

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**